AO 106 (Rev. 04/10) Application for a Search Warrant                    AUSA Jen Aronoff, (312) 886-7643

**FILED**
**8/30/2024**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:                    Case No. 24 CR 378

A cellular telephone,
further described in Attachment A                    Magistrate Judge M. DAVID WEISMAN

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Alexandro Cardoza, a Homeland Security Investigations Task Force Officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, fruits, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(1)(A) | Unlicensed firearms dealing |
| Title 18, United States Code, Section 922(k) | Possession of a firearm with an obliterated serial number |
| Title 18, United States Code, Section 922(o) | Possession/transfer of a machinegun |
| Title 21, United States Code, Section 841 | Prohibited acts related to controlled substances |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

 /s/ Alexandro Cardoza (MDW with permission)
*Applicant's Signature*

ALEXANDRO CARDOZA, Task Force Officer
Homeland Security Investigations
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: August 30, 2024

*M. David Weisman*
*Judge's signature*

City and State: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
                                       )
NORTHERN DISTRICT OF ILLINOIS    )

## **AFFIDAVIT**

I, Alexandro Cardoza, being duly sworn, state as follows:

1. I am a Deportation Officer with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") and have been so employed since June 2019. I am currently assigned as a Task Force Officer with Homeland Security Investigations ("HSI"), Gang and Violent Crimes Task Force.

2. As part of my duties as Homeland Security Investigations Task Force Officer, I investigate criminal violations relating to firearms and narcotics offenses. I have participated in the execution of multiple federal arrest warrants and search warrants.

3. This affidavit is made in support of an application for a warrant to search an Apple iPhone, assigned telephone number 708-362-4008, seized upon the arrest of defendant Geovanny Verduzco Herrera ("Verduzco"), described further in Attachment A (the "**Subject Phone**"), for evidence, instrumentalities, fruits, and contraband described further in Attachment B, concerning unlawful dealing in firearms, in violation of Title 18, United States Code, Section 922(a)(1)(A); unlawful possession of a firearm with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k); unlawful possession/transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o); and prohibited acts related to controlled

substances, in violation of Title 21, United States Code, Section 841 (the "**Subject Offenses**").

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of violations of the **Subject Offenses** are located within the **Subject Phone**.

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

5.     On August 13, 2024, a grand jury indicted Verduzco for violations of the **Subject Offenses** between December 2023 and May 2024. *See* Dkt. 1. During the investigation leading up to the indictment, Verduzco sold an undercover officer (the "UC") a total of six firearms, including one firearm with obliterated serial numbers, and one Glock switch, a device that allows a firearm to automatically shoot more than one shot, without manual reloading, by a single function of the trigger. Verduzco also sold narcotics to the UC in connection with these firearm purchases.

6.     On August 27, 2024, law enforcement arrested Verduzco in connection with the indictment and seized the **Subject Phone**. Since then, the **Subject Phone** has been in the custody of law enforcement.

7.     In summary, the investigation and arrest in this case demonstrates that Verduzco used the **Subject Phone** to commit violations of the **Subject Offenses** and that a search of the **Subject Phone** is likely to yield further evidence.

**A.     Verduzco repeatedly sells guns and drugs to an undercover officer**

**January 24, 2024**

8.     In December 2023, law enforcement found a channel on Telegram, a social media and messaging application, offering guns and drugs for sale. A photo of the Telegram channel is below:



9.     Between January 16, 2024, and January 24, 2024, the UC exchanged written messages[1] on Telegram with the contact person listed for the channel, a user named "LD Trapz." (Based on my experience and the UC's experience in this case, Telegram allows users to call each other as well as send each other text messages and photos, among other features.) In these messages, LD Trapz agreed to sell 7 grams of cocaine to the UC for $420. A portion of the Telegram messages is included below. Specifically, on January 24, 2024, LD Trapz and the UC exchanged the following Telegram messages:

UC: Wtw [what's the word]

LD Trapz: You still need it? [referring to the cocaine]

LD Trapz: If u wanna slide [come by] for it I'll do $420.00 if not I can slide later w [with] driver but I'll need $450.00 to give him for gas $

UC: Yea bro bet [okay] 420 [$420.00]

UC: Im gd [good] to slide [come by]

---

[1] The UC's written communications with the target of this investigation were preserved in photographs, while his oral communications were consensually recorded. Some of the consensually recorded conversations have been summarized in this Affidavit. The summaries do not include all statements made or topics covered during the recorded conversations. To the extent that portions of the consensually recorded conversation appear in quotations herein, the words appearing within quotation marks are based on draft summaries of the consensually recorded conversations, and not on final transcripts of the conversations. In some instances, I have included my interpretations of the quoted language in brackets. My interpretations are based on the contents and context of the consensually recorded conversations, my training and experience as a Task Force Officer, my knowledge of this investigation as whole, and information provided by other law enforcement officers assigned to this investigation, including the UC.

UC: Send me (pin drop emoji) [location]

LD Trapz: 16529 Green St Harvey, IL 60426 United States [buy location]

LD Trapz: Lmk [let me know] when u 5-10 mins [minutes]

LD Trapz: $420 cash park on the street it's next to a parking lot by a pharmacy

UC: Bet [okay]

10.     During their Telegram message conversation on January 24, 2024, LD Trapz instructed the UC to meet near 16529 Green Street in Harvey, Illinois, to buy the cocaine.

11.     On January 24, 2024, the UC met with officers at a predetermined location, obtained prerecorded funds to make the purchase, and was equipped with a video recording device.[2] The UC then drove to 16531 Green Street in Harvey in an undercover vehicle, parking on the street next to the parking lot for a dialysis clinic. There, other law enforcement officers were surveilling the buy location.

12.     According to the UC, recordings of the controlled purchase, and law enforcement agents conducting surveillance, on January 24, 2024, at approximately 12:59 p.m., the UC arrived at the buy location and sent LD Trapz a Telegram message reading, "Here." LD Trapz responded: "Co on my way," and "What car." The UC replied to tell LD Trapz the kind of car he was driving.

---

The UC's telegram messages with Verduzco were consensually recorded by taking screenshots of the messages using the UC's cell phone. The Telegram messages are preserved on the UC's cellphone.

[2] The UC was not equipped with an audio recording device for this transaction.

13.     At approximately 1:02 p.m., surveillance officers saw a silver Chevy Trax bearing Illinois license plate DG68617 pull up behind the undercover vehicle. According to law enforcement databases, the Chevy Trax is registered to Individual A, who is believed to be Verduzco's mother.

14.     According to the UC and law enforcement agents conducting surveillance, a man subsequently identified as Verduzco[3] got out of the driver's seat of the Trax—no one else was in the car—and approached the driver's side window of the undercover vehicle.

15.     According to the UC and recordings of the controlled purchase, at the driver's side window, Verduzco reached into his front pocket and pulled out two clear plastic baggies containing cocaine and distributed them to the UC. In exchange, the UC handed Verduzco $420.

16.     Once the deal was complete, surveillance officers saw Verduzco reenter the silver Chevy Trax and drive away. Law enforcement followed the vehicle and saw it park on the street near a residence subsequently identified as Verduzco's house.[4]

17.     This deal and those described below provide a reasonable basis to conclude that Verduzco uses Telegram under the username LD Trapz.

---

[3] Following the January 30, 2024 controlled buy described beginning in paragraph 18, the UC positively identified Verduzco as the individual he had met with during the January 24 and January 30 deals in an independent photo array.

[4] As described below, surveillance officers observed Verduzco leaving this house before subsequent controlled buys in this case and returning to it afterward. The house is also listed as the address on Verduzco's Illinois driver's license.

**January 30, 2024**

18.     Between January 27, 2024, and January 30, 2024, the UC exchanged more Telegram messages with Verduzco (username LD Trapz). In these messages, Verduzco agreed to sell a Taurus pistol and an eight-ball (3.5 grams) of cocaine to the UC. The two agreed to meet on January 30, 2024, at the same location as the previous deal, on Green Street in Harvey. The screen shot below shows the conversation between the UC (on the right) and Verduzco (on the left) as both arrived at the meeting location, with the UC and Verduzco contemporaneously messaging as they arrived:



19.     On January 30, 2024, the UC met with other officers at a predetermined location, obtained prerecorded funds to make the purchase, and was equipped with a video and audio recording device. The UC then drove to the buy location in an undercover vehicle.

20.     According to the UC, audio and video recordings of the controlled purchase, and law enforcement agents conducting surveillance, on January 30, 2024, at approximately 4:59 p.m., the UC arrived at the buy location in Harvey and parked on the street. At approximately 5:07 p.m., an unknown person driving a black Dodge Charger arrived at the buy location. Verduzco exited the rear passenger side of the black Dodge Charger and then walked toward the undercover vehicle and entered the front passenger side, where he met with the UC.

21.     According to the UC and audio and video recordings of the controlled purchase, once inside the vehicle, Verduzco retrieved a firearm from the right side of his body and also handed the UC a small clear plastic bag containing a white powdery substance in exchange for $1020.

22.     Surveillance officers then saw Verduzco exit the undercover vehicle and walk back to the rear passenger side of the black Dodge Charger. The Charger then left the area.

**February 13, February 16, and February 4, 2024**

23.     In the weeks that followed, the UC and Verduzco exchanged Telegram messages and arranged three more deals, all of which were completed: A February 13,

8

2024 narcotics buy, the sale of a firearm and narcotics on February 16, 2024, and a March 4, 2024 narcotics buy.

24. Each deal was arranged via Telegram messaging and recorded on audio and video, and each deal took place at the Green Street location in Harvey in the same fashion as those on January 24 and January 30 described above, monitored by surveillance officers. Verduzco and the UC messaged each other on Telegram to determine what time to meet and would send each other messages to let the other know when they were arriving at the deal location.

25. For example, at approximately 1:19 p.m. on February 16, Verduzco sent a Telegram message reading, "Im here parked up." One minute later, the UC replied: "Here."

26. At 1:00 p.m. on March 8, 2024, the UC sent Verduzco a Telegram message reading, "10 minutes away." At 1:09 p.m., Verduzco replied: "Pulling up." At 1:11 p.m., the UC responded: "Here."

**March 8, 2024**

27. On March 4, 2024, the UC engaged in a recorded in-person conversation and in Telegram messages with Verduzco, asking him about a rifle and a pistol he had posted for sale on Telegram and asking what his best price would be for the rifle,

9

handgun, cocaine, and a Glock switch.[5] Verduzco agreed to sell the rifle, handgun, cocaine, and Glock switch, with ammunition for both firearms, for a total of $3,300.

28.     On March 8, 2024, the UC met with other officers at a predetermined location, obtained prerecorded funds to make the purchase, and was equipped with a video and audio recording device. The UC then drove to the buy location—near 16531 Green Street in Harvey, the same as before—in an undercover vehicle, where other law enforcement officers were surveilling the area, as well as the area around Verduzco's residence.

29.     According to the UC, recordings of the controlled purchase, and law enforcement agents conducting surveillance, the UC arrived at the buy location and parked his undercover vehicle at approximately 12:29 p.m. Verduzco arrived about ten minutes later. Surveillance officers saw him exit the front passenger side of a black Chevrolet TrailBlazer, carrying a bag. He then entered the front passenger side of the undercover vehicle.

30.     According to the UC and audio and video recordings of the controlled buy, once inside the vehicle, Verduzco pulled three clear plastic knotted bags and one Ziploc bag from the larger bag. These were later determined to contain: one bag containing 12 rounds of 7.62 caliber ammunition, one bag containing 15 rounds of 40 caliber ammunition, one bag containing cocaine, and Ziploc bag containing a Glock switch, and

---

[5] A Glock switch is a device that allows a firearm to automatically shoot more than one shot, without manual reloading, by a single function of the trigger. This device is comprised of three parts: disconnector, conversion back plate, and a selector rod.

handed it to the UC. The UC placed all items into a separate backpack. The UC then handed Verduzco $3,300. Verduzco then put on a black latex glove on his right hand and reached into his backpack and pulled out the rifle and handed it to the UC. Verduzco then pulled out a handgun from the same backpack and handed it to the UC. The UC placed the rifle and handgun into a separate back for storage.

31.     Thereafter, Verduzco left the undercover vehicle and returned to the front passenger seat of the TrailBlazer. Surveillance officers observed as the TrailBlazer left the area and returned to Verduzco's residence, where Verduzco got out of the car and went into the house.

**March 29, 2024**

32.     Following the March 8 deal, the UC continued to message with Verduzco on Telegram, asking if there were any more "toys" (guns) coming soon. Then, on March 27, 2024, the Telegram channel posted a Glock handgun for sale. The UC messaged Verduzco and asked to buy the gun, along with an eight-ball of cocaine. Verduzco agreed to sell both items for $1,500.

33.     Via Telegram, the UC and Verduzco agreed to meet at the same buy location on Green Street in Harvey at about 1:30 p.m. on March 29. However, around the planned meeting time, Verduzco sent the UC a Telegram message saying he was running behind. The meeting ended up taking place at about 2 p.m. instead.

34.     At that time, according to the UC, audio and video recordings of the controlled purchase, and law enforcement agents conducting surveillance, a red Honda

11

Accord pulled up behind the undercover vehicle and Verduzco got out of the passenger side. Verduzco then entered the front passenger side of the undercover vehicle and passed a clear plastic bag of ammunition and the Glock handgun to the UC, noting that the serial numbers on the Glock had been scratched off.

35. During the course of this deal, per the UC and audio and video recordings, the UC asked if he could get Verduzco's phone number because Telegram had been lagging. Verduzco provided the number (708) 362-4008 (the number for the **Subject Phone**) and told the UC to put him down in his contacts as "Dro." Verduzco then left the undercover vehicle and returned to the front passenger seat of the Honda Accord.

36. As both Verduzco and the UC left the area, Verduzco sent the UC a Telegram message asking the UC to come back because Verduzco had forgotten to give the UC the eight-ball of cocaine, and also called the UC via Telegram. According to the UC and audio and video recordings of the controlled buy, the UC returned to the buy location and the Accord pulled alongside the undercover vehicle, facing the opposite direction. The driver of the Accord handed the UC a plastic baggie containing white powder through the driver's side window, while Verduzco, sitting in the passenger seat, apologized for the confusion. The Accord then drove away.

**April 23, 2024**

37. On April 19, 2024, the Telegram channel posted a photo of a "Glock 19 gen 4 (ghost glock)"[6] for sale for $1,050. The UC messaged Verduzco on Telegram and asked about the gun. Below is a transcript of the messages between the UC and Verduzco on April 19, 2024:

> UC: Wtw [whats the word] with the Glock [firearm]
>
> VERDUZCO: When u want it
>
> VERDUZCO: 1050 [$1,050] ghost [polymer] Glock [firearm]
>
> UC: Give me an [8 ball emoji/cocaine] on top for the low [low price]
>
> VERDUZCO: Can do 1160 [$1,160] for the 8 ball [cocaine] and toy [firearm]
>
> VERDUZCO: Lmk [let me know]
>
> UC: Run it [lets do it]

38. Based on my training and experience, my investigation, and the contents and context of the conversation, Verduzco confirms the "ghost Glock" is available and he would sell it for $1,050. The UC then asks Verduzco to add cocaine and Verduzco agrees to sell both items for $1,160.00. Verduzco and the UC agreed to meet at the previous buy location in Harvey on April 23, 2024.

---

[6] Privately made firearms, also referred to as "ghost guns," are firearms that have been assembled by a person other than a licensed manufacturer. These firearms also lack serial numbers.

39.    On April 22 and 23, Verduzco and the UC confirmed in Telegram messages that the deal was still on for the afternoon of the 23rd. Verduzco told the UC to let him know when he was 15 to 20 minutes away from the meeting location.

40.    On April 23, 2024, the UC met with other officers at a predetermined location, obtained prerecorded funds to make the purchase, and was equipped with a video and audio recording device. The UC then drove to the buy location at 16531 Green Street in Harvey in an undercover vehicle, where other law enforcement officers were surveilling the area and the area of Verduzco's residence.

41.    According to the UC, audio and video recordings of the controlled buy, and surveillance officers, the UC drove to the buy location in an undercover vehicle and parked at the buy location at approximately 2:24 p.m. He then messaged Verduzco on Telegram and told him he had arrived. At approximately 2:25 p.m., the UC also made a phone call to the **Subject Phone**. Verduzco, whose voice the UC recognized based on their prior interactions, answered the **Subject Phone**. The UC informed Verduzco that he was at the buy location waiting for him.

42.    Surveillance officers saw a gray Jeep Grand Cherokee arrive at Verduzco's residence and then saw Verduzco exit the house, enter the front passenger side of the Jeep, and leave the area.

43.    A few minutes later, according to the UC audio and video recording, the UC stated that he saw the Jeep and saw Verduzco exit the vehicle. Video shows

Verduzco entering the passenger side of the undercover vehicle at approximately 2:28 p.m.

44.     According to the UC and audio and video recordings of the controlled buy, once inside the undercover vehicle, Verduzco pulled a loaded "ghost Glock" from the inside of his jacket and a 30-round magazine from his right jacket pocket and gave them to the UC. Verduzco also gave the UC a clear knotted plastic baggie containing a white rock substance. The UC handed Verduzco $1,160 in exchange for the firearm and cocaine. Officers then saw Verduzco exiting the undercover vehicle, reentering the Jeep's passenger side, and leaving the area.

45.     Law enforcement officers followed the Jeep back to the garage of Verduzco's residence, located behind the house, and observed as both Verduzco and the driver of the Jeep, an unknown male, entered the garage. After a short time, the unknown male driver reentered the Jeep and left the area.

**B.     Arrest of Verduzco on August 27, 2024**

46.     On August 13, 2024, a grand jury returned an eight-count indictment charging Verduzco with violations of the **Subject Offenses.**

47.     On August 23, 2024, the UC sent Verduzco a Telegram message inquiring whether he had any guns for sale. On August 25, Verduzco replied with two photos of a handgun. The UC asked how much, and Verduzco replied: "$1280 custom barrel and gold muzzle." The UC asked if Verduzco had any other "toys," and Verduzco replied, "Had like 3 more all sold." A photo of the Telegram conversation is below:



48.     On August 27, 2024, Verduzco was arrested at his residence in Harvey. At the time of arrest, Verduzco was holding an Apple iPhone. To verify whether the phone was the same phone Verduzco had previously used to communicate with the UC, officers at the scene had the UC call the phone number Verduzco had previously provided (708-362-4008), and the phone rang.

49.     Officers seized the **Subject Phone**, and it is now in the possession of law enforcement.

16

C.     **Background on Telegram and the use of cell phones in criminal offenses**

50.     The facts set forth above provide a reasonable basis to conclude that Verduzco was using the **Subject Phone** in furtherance of the **Subject Offenses**, and that the phone will contain evidence of those offenses.

51.     Based on my training and experience, Telegram is primarily used on mobile phones, though it can also be used on computers and tablets. The use of Telegram by the UC and Verduzco in this investigation underscores that common usage: The two messaged each other at and near the deal location, including from their cars, while mobile. And, during the transaction on April 23, 2024, the two spoke over the **Subject Phone**.

52.     In addition, the cell phone number Verduzco provided to the UC is the number for the phone seized on August 27.

53.     Based on my training and experience, I know that cell phones may contain relevant evidence of the **Subject Offenses**, including text messages sent or received from the **Subject Phone** that are located in the memory of the **Subject Phone**, which may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the **Subject Offenses**. Moreover, digital photographs located in the memory of the **Subject Phone** may contain further evidence of the **Subject Offenses**, along with images of the user of the **Subject Phone**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to

17

and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

54.     In addition, based on my training and experience, I know that information stored within a cell phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

55.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic

data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

56.    Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses commonly use cell phones to communicate. Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cell phones. Because, as explained above, the **Subject Phone** is associated with the defendant in this case and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the Subject Phone, described further in Attachment A, contains evidence of violations of the **Subject Offenses**.

## II.    SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

57.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.    Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect

20

the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

58.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

59.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

60.     The warrant I am applying for would permit law enforcement to obtain from Verduzco the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the **Subject Phone** pursuant to this warrant. I seek this authority based on the following:

        a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their

21

users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.       If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.       If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of

the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.     The passcode or password that would unlock the **Subject Phone** is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the

23

passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if the **Subject Phone** may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of Verduzco to the fingerprint scanner of the device;[7] (2) hold the device in front of the face of Verduzco and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## III. PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

61. The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol.

62. The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

---

[7] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

24

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

## IV.  CONCLUSION

63.  Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offenses** have been committed, and that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the Subject Phone, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phone** more particularly described in Attachment A,

authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

/s/ Alexandro Cardoza (MDW with permission)
Alexandro Cardoza
Task Force Officer
Homeland Security Investigations

Sworn to and affirmed by telephone 30th day of August, 2024

Honorable M. DAVID WEISMAN
United States Magistrate Judge

26

## **ATTACHMENT A**

## **DESCRIPTION OF ITEM TO BE SEARCHED**

The Apple iPhone seized from Geovanny Verduzco Herrera ("VERDUZCO") upon arrest

on August 27, 2024, pictured below (phone number 708-362-4008):



## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence of violations of Title 18, United States Code, Section 922(a)(1)(A); unlawful possession of a firearm with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k); unlawful possession/transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o); and prohibited acts related to controlled substances, in violation of Title 21, United States Code, Section 841 (the "**Subject Offenses**"), as follows:

1. Names, aliases, and telephone numbers stored in the phone that provide information regarding the identities or locations of the participants and/or coconspirators involved in the **Subject Offenses**;

2. Records of telephone calls made or received and located in the memory of the phone that provide information regarding the identities and locations of, and the methods and means of operation and communication by, the participants and/or co-conspirators involved in the **Subject Offenses**;

3. Text messages, instant messages, or messages transmitted over the internet, made or received, located in the memory of the phone that provide information regarding the identities and locations of, and the methods and means of operation and communication by, the participants and/or co-conspirators involved in the **Subject Offenses**;

4. Location information data located in the memory of the phone that provides information regarding the location or whereabouts of the phone during the coordination and execution of the **Subject Offenses**;

5. Social media, communication software, payment software, or other software located in the memory of the phone that may have served as an instrumentality of the **Subject Offenses** or that may provide information or data regarding the identities and locations of, and the methods and means of operation and communication by, the participants and/or co-conspirators involved in the **Subject Offenses**;

6. Digital photographs or videos located in the memory of the phone that may provide information or data regarding the identities and locations of,

and the methods and means of operation and communication by, the participants and/or co-conspirators involved in the **Subject Offenses**;

7.   Internet browsing or search history located in the memory of the phone that may provide information or data regarding the methods and means of operation by the participants and/or co-conspirators involved in the **Subject Offenses**;

8.   Any SIM card located within the phone that helps to identify and/or confirm the cellular telephone number or numbers associated with the phone;

9.   Any evidence of who used, owned, or controlled the phone, such as logs, configuration files, saved usernames and passwords, browsing history, user profiles, email, and email contacts.

During the execution of the search of the **Subject Phone**, described in Attachment A-2, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of VERDUZCO; or (2) hold the **Subject Phone** front of the face of VERDUZCO and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.